UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELINA ROBERTS, ANTHONY SCIOTTO, ERIC BURNS, KERI DICKEY, ANGELA RAMIREZ, DIANA SANTILLAN, CAMILLE GHANEM, ARNOLD WILLIAMS, OLUWATOSIN BABALOLA, and TOMMY ZAHTILA, TODD JUSTICE, GIANFRANCO PIROLO, MICHAEL O'GRADY, and JASON FOSTER, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> - against - <br><br> THE TJX COMPANIES, INC., a Delaware Corporation; MARSHALLS OF MA, INC., a Massachusetts Corporation; MARMAXX OPERATING CORP., a Delaware Corporation d/b/a MARSHALLS HOMEGOODS, d/b/a MARSHALLS, d/b/a T.J. MAXX HOMEGOODS; HOMEGOODS, INC., a Delaware Corporation; JOHN DOE CORPORATIONS 1-10, inclusive; JOE DOE ENTITIES 1-10, inclusive; and JOHN and JANE DOES 1-10, inclusive, <br><br> Defendants. | Civil Action No. 1:13-CV-13142 (ADB) |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR NOTICE AND CONDITIONAL CERTIFICATION

*Leave to File Excess Pages Granted on July 15, 2015*
**(Request for Oral Argument)**

TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   PROCEDURAL HISTORY............................................................................ 2

III.  STATEMENT OF RELEVANT FACTS ........................................................ 3

    A.    This Case Challenges The Same Defendants And The Same Management
        Structure............................................................................................................ 3

    B.    Plaintiffs Rely On The Same Corporate Evidence Setting Forth ASMs'
        Managerial Duties/Responsibilities And The Absence Of Any Policy
        Requiring ASMs To Perform Non-Exempt Tasks................................................ 4

    C.    Variations In Plaintiffs' Own Testimony Reveal Vastly Different Personal
        Work Experiences.............................................................................................. 6

    D.    Plaintiffs' Co-ASMs And Subordinates Offer The Same Dramatically
        Diverse Testimony Concerning ASMs' Duties .................................................... 9

IV.  LEGAL ARGUMENT .................................................................................. 10

    A.    Judicial Authorization Of Class Notice Under The FLSA ................................. 10

        1.    The Legal Context Within Which Plaintiff's Overtime Claim Must
            Be Adjudicated................................................................................... 10

        2.    Authorization Of Notice Under The FLSA Is Discretionary And
            Should Only Be Granted In "Appropriate" Cases ................................... 12

    B.    Plaintiffs Fail To Prove, Even Implicitly, That Thousands Of ASMs
        Primarily Perform Non-Exempt Tasks, Much Less That Their Primary
        Duty Is Not Management.................................................................................. 14

        1.    Plaintiffs Fail To Identify A Common Facially Illegal Policy ................ 14

        2.    Plaintiffs Fail To Produce "Significant Evidence Of A De-Facto
            Illegal Policy." ................................................................................... 18

    C.    The Same Deficiencies Identified In The Prior TJX Decisions Remain. ............ 20

        1.    Plaintiffs' "narrowly defined" class is, in fact, broader and more
            far reaching than any prior putative class sought to be certified ............. 20

        2.    Plaintiffs' Evidence Is Substantively No Different Than The
            Evidence Previously Presented In The Prior TJX Cases ......................... 21

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

3.   Plaintiffs Have Offered This Court No Reason to Depart From the Precedent Established In The Prior TJX Decisions ................................. 23

V.   CONCLUSION ............................................................................................................ 24

Firmwide 135971927.1 053070.1122

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ahmed v. T.J. Maxx Corp., et al.*,
  2012 U.S. Dist LEXIS 162825 (E.D.N.Y. Nov. 14, 2012) ("*Ahmed I*") ......................... passim

*Ahmed v. T.J. Maxx Corp., et al.*,
  2013 U.S. Dist. LEXIS 81942 (E.D.N.Y. June 8, 2013) ("*Ahmed II*") ........................... passim

*Ahmed v. T.J. Maxx Corp., et al.*,
  2014 U.S. Dist. LEXIS 138240 (E.D.N.Y. Sept. 24, 2014) ("*Ahmed III*") .................... passim

*Ahmed v. T.J. Maxx Corp., et al.*,
  2015 U.S. Dist. LEXIS 62001 (E.D.N.Y. May 11, 2015) ("*Ahmed IV*") ................................1

*Ali v. New York City Health & Hosps. Corp.*,
  2013 U.S. Dist. LEXIS 44091 (S.D.N.Y. Mar. 27, 2013) .......................................................25

*Augustyniak v. Lowe's Home Improvement Center, LLC, et al.*,
  2015 U.S. Dist. LEXIS 110359 (W.D.N.Y. Aug. 20, 2015) ............................................14, 21

*Babin v. Stantec, Inc.*,
  2010 U.S. Dist. LEXIS 88009 (E.D. Pa. Aug. 25, 2010)........................................................15

*Baker v. Home Depot USA, Inc.*,
  2013 U.S. Dist. LEXIS 9377 (N.D. Il. Jan. 24, 2013) ...............................................20, 21, 22

*Becerra v. IM LLC-I*,
  2015 U.S. Dist. LEXIS 56240 (E.D.N.Y. Apr. 29, 2015) ......................................................24

*Bramble v. Wal-Mart Stores, Inc.*,
  2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Apr. 11, 2011) ..................................................25, 15

*Brickey v. Dolgencorp., Inc.*,
  272 F.R.D. 344 (W.D.N.Y. 2011)....................................................................................16, 17

*Ferreira v. Modell's Sporting Goods, Inc.*,
  2012 U.S. Dist. LEXIS 100820 (S.D.N.Y., July 16, 2012) ...................................................20

*Folger v. Medicalodges, Inc.*,
  2014 U.S. Dist. LEXIS 86286 (D. Kan. Jun 25, 2014)..........................................................24

*Gu v. T.C. Chikurin, Inc.*,
  2014 U.S. Dist. LEXIS 53813 (E.D.N.Y. Apr. 17, 2014) ......................................................25

*Guillen v. Marshalls of MA, Inc.*,
  2012 U.S. Dist. LEXIS 91639 (S.D.N.Y. July 2, 2012) .................................................. passim

*Guillen v. Marshalls of MA, Inc.*,
  750 F. Supp. 2d 469 (S.D.N.Y. 2010)................................................................ passim

*Guillen v. Marshalls of MA, Inc.*,
  841 F. Supp. 2d 797 (S.D.N.Y. 2012)........................................................1, 15, 23

*Hall v. Guardsmark, LLC*,
  2012 U.S. Dist. LEXIS 116129 (W.D. Pa. Aug. 17, 2012) ....................................25

*Hoffman-LaRoche, Inc. v. Sperling*,
  493 U.S. 165 (1989)......................................................................................12, 24

*Jenkins v. HomeGoods, Inc., et al.*,
  853 F. Supp. 2d 317 (E.D.N.Y. 2012) .............................................................. passim

*Khan v. Airport Mgmt. Servs., LLC*,
  2011 U.S. Dist. LEXIS 133134 (S.D.N.Y. Nov. 16, 2011) ....................................25

*Moore v. PNC Bank, N.A.*,
  2013 U.S. Dist. LEXIS 74845 (W.D. Pa. May 29, 2013)........................................25

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)........................................................................... passim

*Perry v. Blum*,
  629 F.3d 1 (1st Cir. 2010)...................................................................................9

*Reyes v. Nidaja, LLC*,
  2015 U.S. Dist. LEXIS 101728 (S.D.N.Y. July 31, 2015) ....................................24

*Rios v. Current Carrier Corp.*,
  2015 U.S. Dist. LEXIS 40362 (D. Mass. Mar. 30, 2015).......................................13

*Roberts v. The TJX Companies, Inc.*,
  2015 U.S. Dist. LEXIS 118196 (S.D. Tex., Apr. 13, 2015) .....................................9

*Smith v. Bayer Corp.*,
  131 S. Ct. 2368 (2011)......................................................................................20

*Stevens v. HMSHost Corp.*,
  2012 U.S. Dist. LEXIS 190689 (E.D.N.Y. June 15, 2012) ....................................12

*Stevens v. HMSHost Corp.*, 2014 U.S. Dist. LEXIS 119653 (E.D.N.Y. Aug. 27, 2014).............12

*Vasquez v. Vitamin Shoppe Industries, Inc.*,
  2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11, 2011) .......................................14

*Zhang v. Bailey Produce, Inc.*,
    2013 U.S. Dist. LEXIS 57544 (E.D.N.Y. Apr. 22, 2013) .....................................................25

**STATUTES**

29 U.S.C. § 213(a)(1).......................................................................................................11

29 U.S.C. § 216(b)............................................................................................................12

Fair Labor Standards Act ........................................................................................ passim

**OTHER AUTHORITIES**

29 C.F.R. § 541.100(a).....................................................................................................11

29 C.F.R. § 541.106(a), (b)........................................................................................12, 20

29 C.F.R. § 541.200(a).....................................................................................................11

29 C.F.R. § 541.700(a).....................................................................................................11

29 C.F.R. § 541.700(c).....................................................................................................11

29 C.F.R. § 541.703 .........................................................................................................12

## I.    PRELIMINARY STATEMENT

Notwithstanding *seven* adverse prior decisions which Plaintiffs' counsel blithely

characterizes as "wrongly decided," they once again seek to facilitate notice to a nationwide

class of over 3,000 Assistant Store Managers – Merchandise ("Merchandise ASMs") who

worked at over 1,200 HomeGoods and Marshalls retail stores nationwide (excluding California).

Although *none* of the named Plaintiffs actually reside in Massachusetts, they seek to prosecute

class claims under Federal and *New York State Law*.  The *same* counsel, as in the Prior TJX

Cases,[1] has brought this suit which alleges, the *same* claims concerning the *same* position with

the *same* type of evidence – and even two of the *same* Plaintiffs.  The only material distinction is

the courtroom in which Plaintiffs have now chosen to try their claims.

The evidence presented here is substantively no different (and frankly less compelling)

than the record presented to multiple federal courts in the Prior TJX Cases.  Where Plaintiffs'

ultimate burden of proof is to establish that they and thousands of other Merchandise ASMs

"together are victims of a common policy or plan that violated the law" (*Myers v. Hertz Corp.*,

624 F.3d 537, 555 (2d Cir. 2010)), Plaintiffs continue to point to the same completely *lawful*

---

[1] HomeGoods and Marshalls are distinct and separate corporate entities operating as wholly owned subsidiaries of the parent, The TJX Companies, Inc.  In the interest of brevity and because the prior lawsuits involved The TJX Companies, Inc. as a defendant, Defendants define the "Prior TJX Cases" to include: *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010) (Gorenstein, M.J.) (denying conditional certification) ("*Guillen I*"); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797 (S.D.N.Y. 2012) (Gorenstein, M.J.) (denying Plaintiffs' second motion for conditional certification) ("*Guillen II*"); *Guillen v. Marshalls of MA, Inc.*, 09-cv-9575 (LAP) (GWG), 2012 U.S. Dist. LEXIS 91639 (S.D.N.Y. July 2, 2012) (Preska, C.J.) (*upon a de novo* review of *Guillen II*, finding the Magistrate Judge's decision "to be correct and appropriate" and adopting his decision) ("*Guillen III*") (collectively, "*Guillen*"); *Jenkins v. HomeGoods, Inc., et al.*, 853 F. Supp. 2d 317 (E.D.N.Y. 2012) (Spatt, J.) (denying conditional certification) ("*Jenkins*"); *Ahmed v. T.J. Maxx Corp., et al.*, 10-cv-3609 (ADS) (ETB), 2012 U.S. Dist LEXIS 162825 (E.D.N.Y. Nov. 14, 2012) (Boyle, M.J.) (granting conditional certification) ("*Ahmed I*"); *Ahmed v. T.J. Maxx Corp., et al.*, 10-cv-3609 (ADS) (ETB), 2013 U.S. Dist. LEXIS 81942 (E.D.N.Y. June 8, 2013) (Spatt, J.) (overruling *Ahmed I* as "clearly erroneous" and "contrary to law.") ("*Ahmed II*"); *Ahmed v. T.J. Maxx Corp., et al.*, 10-cv-3609 (ADS) (ARL), 2014 U.S. Dist. LEXIS 138240 (E.D.N.Y. Sept. 24, 2014) (Lindsay, M.J.) (denying Plaintiff's second motion for conditional certification) ("*Ahmed III*"); *Ahmed v. T.J. Maxx Corp., et al.*, 10-cv-3609 (ADS) (AYS), 2015 U.S. Dist. LEXIS 62001, (E.D.N.Y. May 11, 2015) (Spatt, J.) (overruling plaintiff's Rule 72 objections to *Ahmed III*) ("*Ahmed IV*") (collectively, "*Ahmed*").  While there have been *seven* decisions denying Plaintiffs' counsel's efforts to obtain conditional certification, this is Plaintiff's counsel's *tenth* motion for this relief. *See* Marino Decl., ¶ 3.  (Unless otherwise specified, all exhibits and paragraphs referenced herein are to the Marino Declaration).

*policies*, which they claim establish a violation of the law.  These are the same lawful policies which were analyzed and deemed utterly insufficient in the Prior TJX Cases to satisfy Plaintiffs' burden.

The only other distinction is the introduction of nine new named and opt-in Plaintiffs.[2] Even this distinction is without significance, as Plaintiffs and opt-ins attribute their experiences of performing non-exempt tasks to their particular Store Manager ("SM") or District Manager ("DM").  Thus, their collective testimony presents the same record in support of Plaintiffs' request for notice as that considered and rejected in *Jenkins* and *Guillen*, because Plaintiffs fail to identify a factual nexus between their personal working experience and working experiences of the putative class.  Moreover, each Plaintiff recounts a dramatically different experience with contrasting views on the managerial duties they did and did not perform – which is the same type of contrasting evidence that undermined Plaintiffs' counsel's motion in *Ahmed*.

In the end, a *common sense* application of the law, not some purported "TJX Exemption," proves fatal to Plaintiffs' burden, where they must provide *evidence* to permit Your Honor to reasonably infer Plaintiffs' individualized claims of performing tasks as their primary duty is similarly shared by thousands of other ASMs across the country.  This result does not change with Plaintiffs' counsel's re-characterization of the *same* evidence.[3]  Thus, Plaintiffs' motion must be denied *with prejudice*.

---

[2] Plaintiff Santillan and opt-in Razzetti are not included in this count, as Santillan was previously an opt-in in *Guillen* and opt-in Razzetti is *currently* an opt-in in *Ahmed*.  *See Guillen*, 09-cv-9575, Dkt 33 (S.D.N.Y) (Santillan consent to join); *Ahmed*, 10-cv-3609, Dkt. 122 (E.D.N.Y.) (Razzetti consent to join).

[3] There is no dispute that Plaintiffs are relying on the same policies they did before.  Plaintiffs, however, have now changed their characterization of these same policies – for the first time and without any support – by claiming the policies themselves are unlawful.  *Compare See* Plaintiff's Memorandum of Law In Support Thereof For Notice And Conditional Certification ("Ptf. Br."), p. 6 (Dkt. 125).  ("these policies mandated, in actuality, that Merchandise ASMs . . . perform primarily hourly work . . . ."), *with* Jenkins, 853 F. Supp. 2d at 8 ("Plaintiff does not allege that HomeGoods' official, formal policy mandates non-exempt job duties") and *Guillen I*, 750 F. Supp. 2d at 476 (Plaintiff argues Marshalls has "idealized job descriptions and facially lawful standardized company policies") .  Notably, they do not produce a single policy to support their assertion, rendering their claims merely "conclusory assertions," wholly insufficient to establish their burden.  *Myers*, 624 F.3d at 555.

## II.    PROCEDURAL HISTORY[4]

The parties have engaged in an extraordinary amount of pre-conditional certification motion discovery to-date.  Defendants deposed thirteen Plaintiffs and opt-ins, and Plaintiffs deposed six 30(b)(6) witnesses in this action on 12 diverse topics, as well as *ten* separate 30(b)(6) depositions on 55 topics in the *Jenkins* and *Guillen* cases.  ¶ 4.  Moreover, Defendants have produced over *150,000* pages of documents, representing every conceivable policy in existence.  *Id.*  In addition to these documents, Plaintiffs' counsel is also in possession of tens of thousands of documents produced by Defendants in the Prior TJX Cases.[5]  *Id.*

## III.    STATEMENT OF RELEVANT FACTS

### A.    This Case Challenges The Same Defendants And The Same Management Structure.

Defendant The TJX Companies, Inc. ("TJX") owns various subsidiaries, including HomeGoods, Inc. ("HomeGoods") and Marshalls of MA, Inc. ("Marshalls"), which in turn

---

[4] Defendants incorporate by reference the procedural history previously submitted to the Court.  Dkt. 76 (2/11/15).

[5] Given that this discovery in this action dwarfs the discovery exchanged in any Prior TJX Case (as well as likely any other case with these same claims in any federal court), Plaintiffs' claim of seeking notice only on behalf of Merchandise ASMs and not Assistant Store Managers – Operations ("Operations ASMs") has nothing to do with "the first stage discovery record," as Plaintiffs argue.  *See* Ptf. Br. p. 1.  Rather, the exclusion of Operations ASMs is merely an attempt to exclude the damaging testimony offered by the Plaintiffs in this case.  *See e.g.*, Defendants' Motion for Summary Judgment (Dkt. 122-1); Defendants' Statement of Undisputed Material Facts In Support of Their Motion For Summary Judgment (Dkt. 127); *see also* Ex. 2, Pirolo ¶ 237:10-14 ("Q.  Of the managerial duties that you previously testified as having performed, did the merchandise assistant store managers at your store also perform those same managerial duties?  A. Yes."); Ex. 3, Sciotto ¶ 169:12-170:11 (when he was a SM, he directed his Merchandise ASM that he "need[ed] to ensure [that he is] actively managing the entire store and not tasking in the department."); Ex. 4, Burns ¶ 125:5-20 ("Q. How was the Operation ASM similar to the SM?  A. A lot of the same duties, interviewing, the hiring, firing, you know, a lot of the payroll."); Ex. 5, Corway ¶¶ 264:22-265:7 ("Q. So at no point while you were performing associate-level tasks did you suddenly become an associate that is incapable of supervising the individuals around you, correct?  A. That is correct"), 292:6-294:23 (he was always a manager and would address issues immediately or at a later time, irrespective of the task he may have performed); Ex. 6, Zahtila ¶ 299:14-23 (confirming that he and his "co-ASMs would have far more discretion in delegating assignments" and would "determine the priority of assignments that associates and coordinators should perform" in the SM's absence).  Zahtila also testified that *all ASMs* were responsible for enforcing BEST Methods, but not actually performing them (¶ 84:3-9), validating cash variances and shortages (¶ 129:4-8), completing evaluations for associates they supervise (¶ 167:4-19), reviewing applications (¶ 117:14-25), ensuring new-hire paperwork was completed if they are putting the information in the system (108:5-23, providing new-hire orientation (¶ 111:11-25), adjusting and completing payroll (¶¶ 165:5-9, 166:4-22 & 275:11-276:5), overseeing the markdown process (¶¶161:17-162:5), and enforcing directives (¶¶ 27:19-28:3).   This same type of evidence undermined Plaintiff Ahmed's claims in *Ahmed II, III,* and  *IV.*

independently operate HomeGoods and Marshalls retail stores, respectively.  Ex. 18, ¶ 2.

HomeGoods and Marshalls separately employ their own corporate staff who develop and

implement policies and practices unique to their respective retail brand.  *Id.*  Indeed,

HomeGoods' and Marshalls' operational policies are made available only to their respective

store brands.  *Id.*  Similarly, HomeGoods and Marshalls independently determine how to allocate

hours to their respective retail stores by creating and employing their own formulas and take into

account factors specific to their store brands.  *Id.*

At the store level, there is one Store Manager ("SM") and between two to four Assistant

Store Managers ("ASMs") at HomeGoods and two to eight ASMs at Marshalls.[6]  Ex. 7, Brady ¶¶

29:21-30:4; Ex. 18, ¶ 3.  ASMs report to the SM, and they together work as a team in managing

multi-million dollar generating stores.  *Id.*  Marshalls and HomeGoods stores respectively

employ between 35 to 90 and 25 to 55 non-exempt associates, who work throughout the store.

*Id.*  The non-exempt associates are comprised of Coordinators, who are each responsible for a

particular area or department within a store and report to the ASMs, and associates, who are

engaged throughout the store and report to the ASMs.[7]  *Id.*

**B.    Plaintiffs Rely On The Same Corporate Evidence Setting Forth ASMs'
        Managerial Duties/Responsibilities And The Absence Of Any Policy
        Requiring ASMs To Perform Non-Exempt Tasks.**

Consistent with the records developed in all Prior TJX Cases, corporate testimony and

---

[6] There are three types of ASMs:  Merchandise ASM, Operations ASM, and, at Marshalls only, Assistant Store Manager – Customer Experience ("Customer Experience ASM") (collectively, "ASMs").  Ex. 18, ¶ 4.  While the job titles of Merchandise and Operations ASMs at HomeGoods and Marshalls stores are the same, the HomeGoods' and Marshalls' ASM job descriptions are different and are tailored for each respective store brand.  Ex. 19 (Job Descriptions).  For example, in 2013, HomeGoods and Marshalls separately investigated the accuracy of the ASM job descriptions.  Ex. 7, Brady ¶¶ 14:19-18-18:10; Ex. 18, ¶ 4.  The results from the HomeGoods' and Marshalls' investigations, where each company independently interviewed ASMs from their retail stores (i.e., 26 Marshalls ASMs; 10 HomeGoods ASMs), revealed that ASMs were performing the managerial duties described in the job descriptions.  *Id.;* Ex. 20 (sample of interview notes from the job description investigation).
[7] Some stores may have a Key Holder, which is a Coordinator with security privileges.  Ex. 18, ¶ 3.

documentary evidence establish that Merchandise ASMs, are expected to manage[8] their

respective departments, coordinators and associates as their primary duty.[9]  Ex. 7, Brady ¶ 19:11-

19, 13:1-3; Ex. 18, ¶ 5.  While Merchandise ASMs may focus on particular areas of the store,

together with their co-ASMs and SM, they are each independently responsible and accountable

for the revenue, customers, employees, and merchandise in their store.[10]  *Id.*  Indeed, the ASM

and SM shifts are typically staggered so that there is at least one ASM or SM working at any

given time.[11]  *Id.*  As such, a Merchandise ASM, just like an Operations ASM, cannot simply

focus exclusively on his or her assigned departments, but must oversee and manage all

operations of the store when he or she is the only member of management in the store.[12]  *Id.*

    While the Merchandise ASM job descriptions for Marshalls and HomeGoods are

different, they both establish general guidelines regarding the managerial responsibilities ASMs

---

[8] Managerial duties expected of Merchandise ASMs include interviewing and hiring associates, counseling and disciplining associates, terminating associates, directing and supervising associates, evaluating associates, opening and closing stores, supervising the presentation of merchandise, reviewing associate payroll records, ensuring adherence to applicable company policies and procedures by associates within their stores, increasing store revenues by, among other things, analyzing reports and making recommended merchandising changes, waiving or deviating from established policies and procedures without prior approval, investigating and resolving matters of significance, assessing and resolving customer needs, acting as a primary contact with customers on behalf of their store, and coordinating departments and other store activities. Ex. 19 (Job Descriptions); Ex. 18, ¶ 7.

[9] Plaintiffs mischaracterize the testimony of the corporate deponents in suggesting that Merchandise ASMs' actual day-to-day duties are all the same. *See* Marino Decl. ¶ 5 (citing misrepresentations). Rather, the only "uniformity" established by this testimony reveals that ASMs are expected to manage the operations as their primary duty, while the day-by-day actual duties performed by each Merchandise ASM varies. Ex. 7, Brady ¶ 18:11-19.

[10] In fact, the Department of Labor ("DOL") audited a Marshalls store in Virginia and concluded that ASMs were properly classified as exempt because their "primary duty is management" and they were responsible for "supervising numerous employees, conducting performance evaluations, payroll, loss prevention, cash reconciliation, as well as hiring and firing employees." Ex. 21. This finding is consistent with HomeGoods' and Marshalls' investigations into the accuracy of the ASM job descriptions. *See* Ex. 20 (sampling of ASMs' responses); Ex. 18, ¶ 4 (noting 36 ASMs were interviewed).

[11] ASMs and SMs typically work five shifts per week. Ex. 18, ¶ 6. There are a minimum of thirteen managerial shifts at each store (with an opening and a closing shift Monday through Saturday and at least one managerial shift on a Sunday). *Id.* Thus, the SM typically only works five out of the total 13 managerial shifts in a given workweek, leaving ASMs alone in the store as the highest level of management. *Id.*

[12] ASMs are also responsible for the entire store when they are scheduled to be the "Manager on Duty" or "MOD," even if other ASMs or SMs are present. Most stores employ the "Manager on Duty" program, whereby a particular ASM or SM (and in some cases a Key Carrier) are designated to be called upon by non-exempt employees if there are any issues. Ex. 5, Corway ¶ 380:16-24 ("If [the MOD program] was run the way that it was rolled out, then [ASMs] would specifically only be doing manager duties"); Ex. 3. Sciotto ¶¶ 343:24-344:20 (when Sciotto was a SM, he directed his Merchandise ASM that he "need[s] to ensure [he] is actively managing the entire store and not tasking in the department" when he is the MOD).

are expected to perform as their primary duty.  Ex. 7, Brady ¶ 18:20-19:2; Ex. 19.  Merchandise

ASMs are evaluated on their leadership and management skills, and by how they contribute to

the success of the retail store's operations.  Ex. 22 (Sample ASM evaluations).

Neither HomeGoods nor Marshalls maintain any policies which require or suggest that

Merchandise ASMs perform non-exempt tasks, as evidenced by Plaintiffs' inability to submit a

single policy to the Court.  Ptf. Decl. (Dkt 126).  While Marshalls and HomeGoods each have

their own policies which describe, with particularity, the manner by which certain tasks should

be performed by hourly associates, those policies do not – and never have – required or

envisioned ASMs to perform those tasks.  Indeed, contrary to Plaintiffs' counsel's

representations to this Court, Plaintiffs' own testimony is universal on this point.[13]  Rather,

Defendants expect Merchandise ASMs to enforce the policies and ensure they are completed by

non-exempt employees.  *See* n.13.  Quite simply, Plaintiffs have not cited, and cannot cite, to a

single policy which requires or suggests that ASMs perform non-exempt tasks.

### C.    Variations In Plaintiffs' Own Testimony Reveal Vastly Different Personal Work Experiences.

The testimony of the thirteen Plaintiffs and opt-ins reveal vastly divergent levels of

involvement in performing managerial duties and non-exempt tasks, which belie any claim that

the duties and responsibilities of Merchandise ASMs are the same.[14]  Plaintiffs' and opt-ins'

---

[13] *Compare* Ptf. Br. p. 6 ("Plaintiffs collectively testified that they spent the majority of their time on non-managerial work *in conformity with tasks derived from Defendants' company-wide policies and which demanded Merchandise ASMs to adhere to highly-structured procedures for receiving and processing merchandise* (*see BEST and Best Methods, pp. 7-9, infra*") (emphasis added) *with* Ex. 11, Ghanem ¶ 143:12-16 (only associates and coordinators should be touching the merchandise); Ex. 12, Roberts I ¶ 49:12-22 (BEST applied to associates and she was responsible for ensuring they were following policies); Ex. 6, Zahtila ¶ 83:23-84:9 (Zahtila, a "Best Methods Champion," had no memory of any policy requiring ASMs to perform tasks; ASMs are expected to enforce policies, but not actual perform those policies themselves); Ex. 2, Pirolo ¶ 258:24-259:8 (no policy requiring ASMs to perform associate level tasks).

[14] At deposition, Plaintiffs' counsel used a standard script of leading questions to which each Plaintiff and opt-in plaintiff robotically answered in the affirmative regardless of whether such answers directly contradicted his/her prior responses during direct.  *See e.g.,* Ex. 8, Costa ¶ 336:20-338:14, 266:8-17, *but see* 325:23-328:2; Ex. 5, Corway ¶ 395:23-397:14; Ex. 14, McKenzie ¶ 51:9-14, *but see* 283:25-284:2; Ex. 6, Zahtila ¶ 339:25-340:9; Ex. 13,

testimony varied regardless of the particular topic, from whether they performed a particular

non-exempt task[15] or were responsible for a particular duty,[16] to the most fundamental issue of

all:  the reporting structure in each store.[17]

Any contention that Merchandise ASMs are not managers and are relegated to associate

level-tasks is irreconcilable with the testimony presented here.[18]  For example, Merchandise

ASM Costa testified that he performed all the managerial duties in the Merchandise ASM job

description (Ex. 8, Costa ¶¶ 149:23-150:15),[19] including making final decisions to hire (¶ 215:6-

15), recommendations for hire (¶ 171:15-22), disciplining employees (¶¶ 84:13-22, 178:20-

180:13, 181:21-182:7, 186:10-25, 188:10-17, 189:10-14, 195:14-21), training employees

simultaneously when performing non-exempt tasks (¶¶ 175:14-176:7), correcting and closing

---

Roberts II ¶ 314:4-18.  As such, the import of each Plaintiffs' and opt-ins' experience cannot be gleaned by reviewing the questions asked by his or her counsel, but by reviewing the full transcript.  Moreover, Plaintiffs' testimony cannot be understood either by Plaintiffs' counsels' representation of it, as they have repeatedly mischaracterized their clients' testimony here, as well as the plaintiffs' testimony in the Prior TJX Cases.  *See* ¶ 5.  Indeed, in *Ahmed II*, Judge Spatt overruled as clearly erroneous a factual finding by Magistrate Judge Boyle in *Ahmed I*, who accepted Plaintiffs' counsels' mischaracterization that ASM Papparatto supported plaintiff Ahmed's claims.  *See Ahmed II*, at *34-35.  Plaintiffs' counsel also made mischaracterization in *Guillen*, which caused Chief District Judge Preska to rebuke Plaintiffs' counsel.  *See Guillen III*, at * 6 ("[Plaintiffs' counsel's representation] "is both inaccurate and borders on misrepresenting Judge Gorenstein's opinion.").

[15] *Compare* Ex. 4, Burns ¶ 127:8-16 ("didn't even know how to ring the register"; SM and DM told ASMs not to operate a register; operating a register was "taboo"), Ex. 12, Roberts I ¶ 69:1-2 ("[DM] said managers should not be on the registers."), *with* Ex. 11, Ghanem ¶ 40:7-10 ("Always on the register"), Ex. 5, Corway ¶ 341:22-342:9 (up to 25 hours per week operating the register).

[16] *Compare* Ex. 9, Razzetti ¶ 255:22-256: 11 (She had no responsibilities for ensuring the safe was locked), *with* Ex. 13, Roberts II ¶ 225:24:226:1 (terminated for failing to lock the safe before closing).

[17] Some Plaintiffs testified that everyone in the store reported to the SM and no one reported to the ASMs (Ex. 4, Burns ¶¶ 90:21-91:2; Ex. 15, Ramirez ¶72:17-25, Ex. 9, Razzetti ¶ 89:24-90:5; Ex. 17, Santillan II ¶29:21-23), while others testified that associates and coordinators reported to ASMs, who in turn reported to the SM.  *See* Ex. 5, Corway ¶ 169:15-170:14; Ex. 6, Zahtila ¶ 47:25-48:11; Ex. 2, Pirolo ¶ 300:7-16; Ex. 3, Sciotto ¶ 66:24-67:25.

[18] *See* Ex. 5, Corway ¶ 104:4-23 (in the absence of a SM, "we [i.e., ASMs] had the autonomy to make the decisions" of the objectives to complete); Ex. 2, Pirolo ¶ 322:17-23 (ASMs are responsible for everything in the store on Sundays); Ex. 15, Ramirez ¶ 177:17-178:2 (when the SM is absent, "of course, if something happens in the store, they're going to call me.  So it's like if I was supervising them."); Ex. 11, Ghanem ¶138:4-12 (he was responsible for supervising all the employees in the store when he was the only member of management present); Ex. 14, McKenzie (97:3-15) ("[Merchandise ASMs] were all assigned to our own area, but we had to -- the store was a whole, but if a manager wasn't there, you had to make sure the work was still getting done.").

[19] *See also* Ex. 8, Costa ¶¶ 133:21-25 ("I ran the store"), 57:19-58:5 ("The assistant managers were the leadership of the store"); 49:22-50:3; 95:24-96:6 and 107:18-22 (he was the "point person" at his store), 72:11-21 (he mentored other ASMs); 91:3-7 (he was responsible for turning around a struggling store); 91:21-92:16 (he established standards and mentored a new management team), 121:10-15 and 140:22-141:2 (he was responsible for the reallocation of 75 associates after super storm Sandy).

payroll (¶¶ 143:5-13, 203:10-204:23), completing new-hire paperwork (¶ 166:13-170:18),

engaging scheduling functions (¶¶ 143:2-4, 209:6-10, 210:18-21), and performing audits (¶¶

230:10-231:13, 234:14-235:15).  In fact, when three stores within Costa's district had a SM

vacancy, Costa was assigned, in his capacity as a *Merchandise ASM*,[20] to manage those stores.[21]

Despite widely divergent experiences, Plaintiffs testified that their performance of an

associate task did not suddenly relinquish them of their overall managerial responsibilities.

Indeed, even when they performed a non-exempt task, Plaintiffs would still observe those around

them and provide counseling or praise as needed, simultaneously providing training to

employees by showing them how to perform a task, and/or stop what they are doing to respond

to requests for their managerial assistance.[22]

Plaintiffs also testified that their performance of associate tasks was a result of their SM –

not some company-wide policy.[23]  In fact, opt-in Razzetti testified that the average amount of

time she spent performing managerial duties varied between stores and resulted not from any

---

[20] Costa testified that he was a Merchandise ASM from 2008 through his resignation in June 2013.  Ex. 8, Costa ¶¶ 145:23-146:4; 133:6-12.

[21] *See* Ex. 8, Costa ¶¶ 42:17-44:12, 50:7-51:4, 81:3-9, 69:2-13, 102:8-18; *see also* Ex. 23, p. 1-3 (Costa's Resume), Costa ¶ 332:18-21 (resume is truthful and accurate).

[22] Ex. 9, Razzetti ¶ 228:10-15 (if she observed something inappropriate even while performing a task, she would subsequently address the issue); Ex. 11, Ghanem ¶ 323:20-324:10 (would coach associates and correct poor performance, even if he was operating a register); Ex. 15, Ramirez ¶ 172:9-17 (if she observed associates acting improperly even when she was performing a task, she may have coached them); Ex. 9, Razzetti ¶ 224:8-24 (worked alongside associates so they could follow what she was doing); Ex. 17, Santillan II ¶ 36:12-37:6 (same); Ex. 8, Costa ¶ 175:14-176:2 (same); Ex. 14, McKenzie ¶ 175:12-24 ("very common" for ASMs to be called to resolve a customer complaint).  *See also* Operations ASMs' testimony applicable to Merchandise ASMs:  Ex. 5, Corway ¶ 111:9-25 ("Q. Was there any time during your tenure as an ASM that you were not responsible for supervising associates?  A. There wasn't any time that I wasn't responsible by the company's structure, but when I was ringing a register or in the back of the store taking the truck in, I obviously couldn't manage a majority of the staff other than the people right in my immediate [area] . . . ."), ¶¶ 264:22-265:7 ("Q. So at no point while you were performing associate-level tasks did you suddenly become an associate that is incapable of supervising the individuals around you, correct?  A. That is correct"); Ex. 2, Pirolo ¶ 263:9-13 (Q. Was there a time during your tenure as ASM where you weren't responsible for ensuring that company policies were being complied with?  A. No.").

[23] Ex. 10, Dickey ¶157:14-158:3 (if SM gave her the opportunity to be a manager, then her duties would have been consistent with the job description), 190:6-19 (SM prevented her from performing her job properly); Ex. 15, Ramirez ¶¶ 178:15-22 (performed tasks because her SM told her to do so, not because of some policy), 142:7-17; Ex. 11, Ghanem ¶ 126:25-127:17 (SM required him to task rather than perform managerial functions, which was "more of a personality issue" between him and his SM); Ex. 4, Burns ¶¶ 178:13-18 ("[SM] did not want me to [interview candidates]"), 308:14-15 (DM and SM "highly micromanaged [the] store").

policy but rather from the management style of each SM.[24]

Consistently, all the Plaintiffs sought at deposition to minimize the overwhelming documentary evidence which directly refuted any notion that ASMs were not expected to perform and did not in fact perform managerial duties.  Despite their efforts, Plaintiffs ultimately could not deny having performed some, if not all, of the managerial duties contained in the documentary evidence.  This documentary evidence includes Plaintiff's own comments in their performance evaluations, comments in performance evaluations they wrote and issued to their direct reports, their resumes, their applications for subsequent employment, and their resignation letters.[25]  The record even includes two *decisions* (one from a federal court and another from an administrative agency) – of which the Court should take judicial notice – concerning two of the Plaintiffs that found them to be responsible for store management.[26]  In fact, Plaintiff Roberts is judicially estopped from now claiming she was not manager, when she previously claimed the opposite in order to advance her unsuccessful claim of being a victim of retaliation.[27]

Finally, many Plaintiffs acknowledged that they either did not know the duties performed

---

[24] Ex. 9, Razzetti ¶ 273:2-7 ("Q. So obviously, according to you, depending on the store you're in will vary the amount of managerial/non-managerial duties you perform, correct?  A. No.  I think it depends on the store manager.").

[25] *See e.g.*, Ex. 22 (Costa's Evaluations); Ex. 8, Costa ¶ (266:8-17) (words in the self-reviewer comments on the evaluation are "ultimately" his own); Ex. 23 (Costa's and Ghanem's resume); Ex. 8, Costa ¶ 47:13-48:4 (resume is accurate); Ex. 11, Ghanem ¶ 37:15-19 (same).

[26] *Roberts v. The TJX Companies, Inc.*, 13-cv-172, 2015 U.S. Dist. LEXIS 118196 (S.D. Tex., Apr. 13, 2015) (granting summary judgment to Defendant on Plaintiff Roberts' discrimination claims and finding that "Plaintiff [Roberts] managed in-store operations, including customer service, merchandising, supervising other employees, and securing the cash office. . . . Plaintiff was responsible for the cash office . . . [and] ensuring that the store's alarm was engaged . . . ."); *see also* Ex. 24, p.3, Zahtila Unemployment Decision (A.L.J. Case No. 012-24235) (finding Zahtila's "job duties consisted of managing and being responsible for all operations with the store, from hiring employees and human resources duties to maintaining the physical premises of the store.").

[27] *See Perry v. Blum*, 629 F.3d 1 (1st Cir. 2010) (judicial estoppel "prevent[s] a litigant from taking a litigation position inconsistent with the litigation position successfully asserted by him in an earlier phase of the same case or in an earlier proceeding," which serves to "protect the judicial process" by preventing "a litigant [from] play[ing] fast and loose with the courts.").  *See e.g.*, Ex. 12, Roberts' I ¶¶ 41:23-42:11 ("And the merchandise managers [i.e., Merchandise ASMs], we have to do merchandise management plus HR operations"), 42:23-43:13 (handful of employees reported to her and she was responsible for making their schedule), 46:11-47:15 (performed most of the duties in the Merchandise ASM job description), 48:21-49:5 (trained employees).  *See also* n.26 (court relying on Plaintiff Roberts' testimony).

by other ASMs in their own building or that other ASMs performed more managerial functions than they did.[28]  In short, the roles and responsibilities of Plaintiffs varied from employee-to-employee and from store-to-store.  This record simply does not support a common policy or practice among this group of ASMs challenging their exempt status, much less a larger (or nationwide) group.

### D.  Plaintiffs' Co-ASMs And Subordinates Offer The Same Dramatically Diverse Testimony Concerning ASMs' Duties.

In stark contrast to Plaintiffs' self-serving arguments in their motion (regardless of whether those arguments were consistent with their own deposition testimony), other ASMs who worked with Plaintiffs all testified that they commonly engage in managerial functions including: duties associated with opening and closing the store; interviewing, hiring, and training; scheduling; delegating assignments; enforcing company policies; resolving customer complaints; disciplining; and driving revenue; all without (or with minimal) SM involvement.[29]  *See* Ex. 1.

Similarly, Plaintiffs' direct reports (*i.e.*, associates and coordinators) were often shocked

---

[28] Ex. 12, Ghanem ¶¶ 130:6-12 (other ASMs in his store performed managerial duties that he did not because of his poor relationship with his SM), 125:3-22 (he felt like an "outsider"); Ex. 8, Costa ¶ 336:20-338:14 (unable to testify as to other ASMs); Ex. 14, Roberts II 92:25-93:9 (same); Ex. 11, Dickey ¶ 136:13-17 (same); Ex. 15, McKenzie ¶ 124:13-18 (same); Ex. 4, Burns ¶ 65:1-4 (same), 67:10-12 (same), 292:9-22 (same); Ex. 16, Ramirez ¶ 178-23-180:21, 181:17-182:7 (same); Ex. 9, Razzetti ¶ 269:6-11 (same); Ex. 18, Santillan II ¶ 27:5-8 (same).

[29] Any claim that these declarations should be dismissed as "happy camper" declarations should be rejected for two reasons.  First, Plaintiffs referenced these declarations in support of their motion, thereby waiving any claim that such declarations should not be considered.  Ptf. Br. p. 22.  Second, nearly all of the declarations were produced before the depositions for each Plaintiff – occurring well over seven months ago.  ¶ 6 (identifying the production date of each declaration).  Thus, Plaintiffs had the opportunity to depose these declarants, but made the strategic decision not to do so.  This decision is undoubtedly the result of the litigation in *Ahmed*, where Plaintiffs' counsel took the depositions of the declarants, which ultimately created a more in-depth record demonstrating the inappropriateness of conditional certification.  We also note that Plaintiff Sciotto testified that he spoke with three declarants, including Kristen Bjertnes, who purportedly told him that not everything they discussed with Defendants' attorneys was included in their declarations.  Ex. 3, Sciotto ¶¶ 22:6-23:24.  As a result, he considered these declarations to be "altered," but confirmed that no one with whom he spoke with said their declarations were inaccurate or false.  *Id*.  Plaintiff Sciotto's hearsay and inadmissible testimony, even if credited, should not deter this Court from considering the declarations.  First, he did not testify that the declarations were false or inaccurate – which is the whole point.  Second, Plaintiff Sciotto's testimony on this point is questionable, at best, as Defendants obtained a second declaration from Bjertnes, who reviewed Plaintiff Sciotto's testimony and disputes ever having a conversation with him about the declarations, let alone saying her declaration was "altered."  Ex. 1, p. 7-9.  Rather, Ms. Bjertnes' again testified that her first declaration (Ex. 1, p. 1-6) remains true and accurate.  *Id*.

and confounded by the notion that Plaintiffs, who issued directives, supervised them, and

evaluated their performance, now claimed they were not "managers."  *Id.*  Even Plaintiffs' direct

reports testified concerning their experiences working under the direction of Plaintiffs.  *Id.*

## IV.   LEGAL ARGUMENT

### A.   Judicial Authorization Of Class Notice Under The FLSA.

#### 1.   The Legal Context Within Which Plaintiff's Overtime Claim Must Be Adjudicated.

Plaintiffs challenge their exempt status under the FLSA, *see* 29 U.S.C. § 213(a)(1), by

claiming that Defendants did not employ them in a bona fide executive or administrative

capacity – or a combination of both exemptions.  *Id.*  To test Plaintiffs' legal theory in the

context of a retail assistant manager case, accordingly, the record must be developed to

determine whether Plaintiffs' (or potentially other ASMs') primary duty consisted of the

management of a recognized retail department or subdivision; whether they customarily directed

the work of two or more employees; whether they had authority to make recommendations

regarding employees' change in status; or alternatively, whether their primary duty included non-

manual work related to the management of Defendants' business, including the exercise of

discretion and independent judgment.  *See* 29 C.F.R. § 541.100(a) (describing the requirements

of the executive exemption); 29 C.F.R. § 541.200(a) (administrative exemption).

The DOL defines "primary duty" to mean "the principal, main, major or most important

duty that the employee performs."  29 C.F.R. § 541.700(a).  In a retail setting, DOL regulations

provide that ASMs may have management as their primary duty "even if the [ASMs] spend more

than 50 percent of the time performing nonexempt work such as running the cash register."  *See*

29 C.F.R. § 541.700(c).  The DOL regulations also specifically envision exempt ASMs

concurrently performing "exempt and nonexempt work" and "make[ing] the decision regarding

when to perform nonexempt duties." 29 C.F.R. § 541.106(a), (b) ("An assistant manager can supervise employees and serve customers at the same time," as well as "simultaneously direct the work of other employees and stock shelves" without losing the exemption"). Additionally, the context by which a task is performed determines whether the activity is exempt or non-exempt work. *See* 29 C.F.R. § 541.703. Thus, the mere performance of non-exempt tasks – for even more than 50% – is not dispositive as to whether an ASM is misclassified as exempt from overtime. Moreover, the performance of non-exempt tasks must also take into consideration whether, as for the Plaintiffs here, they were also supervising those around them. It is within the foregoing legal lens through which the request for judicial intervention must be examined.

### 2. Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In "Appropriate" Cases.

The FLSA does not expressly – or impliedly – authorize the judicial "notice." The Act simply permits an individual to bring an action for unpaid overtime on his own behalf "and other employees similarly situated." 29 U.S.C. § 216(b). In *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989), the Supreme Court held that district courts "have discretion, *in appropriate cases . . . to implement*" the collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs." *Id.* at 169 (italics added); *Myers*, 624 F.3d at 555 n.10 (nothing in the FLSA requires court-authorized notice, although it "may be a useful 'case management' tool for district courts to employ in 'appropriate cases'"). Thus, the question committed to this Court's discretion, in consideration of all the evidence and the history of litigation on the issues raised by Plaintiffs, is whether this is an "appropriate case" to grant the requested relief.[30]

---

[30] Plaintiffs reference *Stevens v. HMSHost Corp.*, where conditional certification was granted (2012 U.S. Dist. LEXIS 190689 (E.D.N.Y. June 15, 2012)), and then decertified following discovery depositions (2014 U.S. Dist. LEXIS 119653, at *15-18 (E.D.N.Y. Aug. 27, 2014)), for the proposition that the two-stage system worked because litigation is ongoing with those individuals that previously opt-ed into the lawsuit. Ptf. Br. p. 14 n.44. Plaintiffs, however, misapprehend the purpose of notice under the FLSA, which is to facilitate the efficient, speedy resolution of collective claims, not solicit new clients for Plaintiffs' counsel.

In exercising their judicial discretion, courts determine whether plaintiffs have satisfied their burden to make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that *violated the law*." *Jenkins*, 2012 U.S. Dist. LEXIS 46394, at \*7-8 (citations and quotations omitted, emphasis added). A violation of the law, in the context of a misclassification under the executive and administrative exemptions in a retail setting, focuses on the primary duty of the ASM and is not established simply because an ASM performs non-exempt duties more than 50% of their time. *See supra* Section IV.A.1. As such, Plaintiffs must provide evidence sufficient for the Court to reasonably infer that thousands of ASMs across the country performed non-exempt tasks as their primary duty. *See Jenkins*, \*11 (Plaintiff must offer "some identifiable factual nexus which binds [himself] and potential class members together as victims of a particular practice."); *Ahmed III*, n.8 (noting that evidence of ASMs' performance of non-exempt tasks does not govern classification under the FLSA). Plaintiffs cannot rely on unsupported assertions, but rather must support their contentions with actual evidence.[31] *Meyers*, 624 F.3d at 555; *Rios v. Current Carrier Corp.*, 14-cv-10247 (GAO), 2015 U.S. Dist. LEXIS 40362 (D. Mass. Mar. 30, 2015) ("unsupported allegation of a common plan or company policy is insufficient").

Because there is no dispute the ASM job descriptions do not identify non-exempt tasks, much less require ASMs perform non-exempt tasks, Plaintiffs cannot rely on a common job description or other lawful policies to unify the class. Here, Plaintiffs point generally to *lawful* operational policies and the existence of "lean labor budgets" and claim the consequence of such policies or budgets "mandated, in actuality, that Merchandise ASMs . . . primarily perform hourly work." Ptf. Br. p. 6. Accordingly, Plaintiffs must show some *evidence* for the Court to

---

[31] Here, like the Prior TJX Cases, Plaintiffs' counsel refers generally to policies, but fails to produce a single policy which requires ASMs to perform non-exempt tasks and that violates the law. Moreover, an assertion does not become "supported" when a Plaintiff robotically answers "yes" to scripted questions on re-direct.

reasonably infer that those policies and labor budgets, certainly legal on their face, practically

resulted – as a *de facto* "policy" – in thousands of Merchandise ASMs similarly performing non-

exempt tasks as their primary duty.  This inquiry focuses on whether there is some evidentiary

nexus to unify Plaintiffs to the thousands of ASMs, not whether Plaintiffs and the putative class

are, in fact, misclassified as exempt.[32]

In conducting this analysis, the Court properly considers *all* of the evidence submitted by

the parties, including evidence that contradicts Plaintiffs' allegations, as well as the evidence

submitted in the Prior TJX Cases.  *See Ahmed II* (considering evidence of the labor budget);

*Ahmed II, III, IV* (considering adverse testimony which undermined plaintiff Ahmed's claims);

*Vasquez v. Vitamin Shoppe Industries, Inc.*, 10-cv-8820, 2011 U.S. Dist. LEXIS 74376, at *5-6

(S.D.N.Y. July 11, 2011) (considering defendants' evidence and declining to grant nationwide

conditional certification); *see also Augustyniak v. Lowe's Home Improvement Center, LLC, et

al.*, 14-cv-488 (JJM), 2015 U.S. Dist. LEXIS 110359, at *41-42 (W.D.N.Y. Aug. 20, 2015)

(considering evidence in a prior collective action case where plaintiff's counsel brought a copy-

cat lawsuit in another jurisdiction).  Here, extensive deposition, written discovery and

declarations have been exchanged and is before the Court; all of which much be considered in

determining whether Plaintiffs have met their burden of proof.

B.    **Plaintiffs Fail To Prove, Even Implicitly, That Thousands Of ASMs
      Primarily Perform Non-Exempt Tasks, Much Less That Their Primary Duty
      Is Not Management.**

1.    **Plaintiffs Fail To Identify A Common Facially Illegal Policy.**

As in the Prior TJX Cases, Plaintiffs continue to focus their argument on entirely lawful

---

[32] There is an important distinction between the Court's: (1) determination of whether Plaintiffs are in fact
misclassified (which is a merits determination), and (2) analysis of all the evidence to ascertain whether there is a
factual nexus sufficient to conclude all ASMs nationwide similarly perform non-exempt tasks as their primary duty.
The latter is not a merits determination prohibited at the first stage analysis.  *See Guillen III,* at *6-7 and *Jenkins,* at
322 (dismissing Plaintiffs' counsel's claims to the contrary).

job descriptions, policies and procedures which apply to all Merchandise ASMs in an attempt to

establish that they are similarly situated to thousands of ASMs nationwide.  Of course, lawful job

descriptions and policies like the ones at issue which do not require ASMs to primarily perform

non-exempt tasks are of no use to Plaintiffs in their effort to meet their burden.  *See Guillen I*, 750

F. Supp. 2d at 477-48 (the existence of standardized operational procedures, management

program, policies, and an identical hierarchal management structure "does little to add to the

inference that ASMs nationwide were similarly situated to Guillen with respect to his claim that

he was required to spend a majority of his time performing non-exempt tasks."); *Guillen II*, 841

F. Supp. 2d at 802 (same); Harriel, 2012 U.S. Dist. LEXIS 97527, at *17 ("The existence of a

job description containing many material tasks applicable to a certain position, paired with a

superficial allegation that plaintiff was improperly classified as exempt under the FLSA, misses

the point of a putative FLSA collective action such as the one pursued here, insofar as the action

turns on the alleged discrepancy between the job on paper and the job in practice but the

evidence fails to show how the plaintiff and others were similarly subjected to an improper

compensation practice by defendant."); *see also Bramble*, 2011 U.S. Dist. LEXIS 39457, at *15;

*Babin v. Stantec, Inc.*, 2010 U.S. Dist. LEXIS 88009, at *11-12 (E.D. Pa. Aug. 25, 2010).

     In this case, Plaintiffs have modified their argument to allege – based on the same

evidence – that the policies themselves were unlawful by "mandat[ing], in actuality, that

Merchandise ASMs . . . perform primarily hourly work . . . ."  Ptf. Br. p. 6; n.3.  In support of

their assertion that the company-wide policies "demanded Merchandise ASMs adhere to highly

structured procedures for receiving," Plaintiffs cite, not to any actual policy, but to

mischaracterizations of 30(b)(6) testimony (*see* Marino Decl. ¶ 5) and Plaintiffs' robotic

responses to Plaintiffs' counsel's leading questions on re-direct.  The most telling example of the

absence of any unlawful policies (besides Plaintiffs' inability to produce them) is the testimony

of Plaintiff Tommy Zahtila, who received specialized training at Marshalls' corporate

headquarters to become a "Best Methods Champion."  *See* Ex. 6, Zahtila ¶¶ 206:22-207:7,

242:6-17.  In this capacity, Plaintiff Zahtila held meetings and went "over company policies and

procedures to make sure that the other ASMs in the company [knew] the policies and procedures

and Best Methods."  *Id.,* ¶¶ 206:19-207:7.  Not only was Plaintiff Zahtila unable to recall a *single*

policy which required ASMs to physically perform associate level tasks (Zahtila ¶¶ 83:15-84:9),

he also confirmed that ASMs' were expected only to enforce the Best Methods.  *Id.,* ¶ 84:3-9

("Q. And [ASMs] are expected to enforce, but not actually perform the Best Methods? A. Yes).

Other Plaintiffs similarly testified that there were no policies which they were aware of during

their tenure that required ASMs to perform non-exempt tasks.  *See supra* n.12.

Plaintiffs also reference the existence of "lean labor budgets for profitability" which

purportedly supports their burden.  Ptf. Br. p. 6.  Plaintiffs ignore, however, that courts have

squarely rejected the proposition that the manner in which a retailer allocates payroll hours to its

stores, even if "miserly," could conceivably result in compelled violations of the FLSA, and

therefore, a "similarly situated" class of victimized employees.  In *Brickey v. Dolgencorp., Inc.*,

272 F.R.D. 344, 347 (W.D.N.Y. 2011), the court rejected plaintiffs claim that Dollar General's

labor budget caused them to be victims of a "common policy or plan that violated the law"

simply because said budgets indirectly encouraged managers to mischaracterize, under-report, or

falsify time records. *Id.* at 347–48.  Thus, the *Brickey* court denied plaintiffs' motion for

conditional certification, declining to hold that facially-lawful policies "can form the equivalent

of a 'common policy or plan that violate[s] the law,' merely because they *indirectly* might

encourage the minimization of overtime."  *Id.*

16

Plaintiffs make a similar argument here, asserting that the Defendants "required stores to maintain lean labor budgets for profitability." Ptf. Br. p. 6. They made a similar argument in *Ahmed I* which the Court summarily discredited.[33]  As in *Brickey* and *Ahmed I*, there is no "factual nexus" between a perfectly lawful labor allocation calculus or "policy," and the individual decisions made by SMs or ASMs themselves regarding how to construct schedules based upon budgeted hours.[34]

As in the Prior TJX Cases, Plaintiffs also continue to point to neutral business practices and make arguments (with absolutely no factual support) about alleged heavy-handed corporate control as evidence of illegal conduct that binds the class together. For example, Plaintiffs suggest Defendants' exercise overreaching control over ASMs because they receive communications via emails through a program called "Reflexis." The communications themselves – containing, for example, legal matters and product safety recalls – can have no conceivable impact on Plaintiffs' exempt status, however.[35]  *See* Ex. 9, Razzetti Dep. ¶¶ 210:2-211:17; Ex. 3, Sciotto Dep. ¶¶ 358:6-359:12. Plaintiffs also suggest (but do not describe) that the Code of Conduct supports their claim that Defendants "set[] and direct[] how Merchandise ASMs spend their days." Ptf. Br. p. 9. The Code of Conduct is similarly irrelevant to Plaintiffs' burden; it contains policies prohibiting harassment, discrimination and addresses other common sense ethical concerns. *See* Ex. 25 (Code of Conduct). All of this "evidence" was previously

---

[33] Notably, Plaintiffs offer no documentary evidence to support these claims, relying instead on bald and conclusory assertions. In fact, Plaintiffs declined to seek discovery concerning the labor budgets undoubtedly because discovery of that same information in *Ahmed* worked to plaintiff's disadvantage, as he received demonstrative proof which directly undercut his theory of liability. ¶ 17; *see also Ahmed II*, at *43 ("[T]he evidence suggests that Defendants' labor demands simply corresponded with Defendants' planned sales"; "such equivocal evidence cannot sustain preliminary certification").

[34] Plaintiff Corway testified that his DM Anita Mung arbitrarily reduced the amount of payroll funding Marshalls intended to provide to his store. Ex. 5, Corway ¶¶256:24-258:7, 381:5-16. Thus, Plaintiffs Corway, Sciotto, Zahtila, Costa, and McKenzie, all of whom worked for DM Mung (who Marshalls subsequently released), cannot testify as to whether their store would have had sufficient funding if the DM did not reduce their labor budget.

[35] "E-merch" (which does not exist at HomeGoods) and "E-pack" are other communication devices, which are similarly unremarkable. Ex. 6, ¶¶ 219:3-220:15 (provides guidance for only some of the merchandise in the store); Ex. 3, Sciotto ¶ 379:9-23 (general guidance).

raised in the Prior TJX Cases and similarly found to be insufficient to justify notice.

### 2. Plaintiffs Fail To Produce "Significant Evidence Of A De-Facto Illegal Policy."

In the absence of a common illegal policy, Plaintiffs "need to produce significant evidence of a de-facto illegal policy where an official legal policy existed." *Ahmed I*, at *37. Plaintiffs must show "significant evidence" of a de-facto policy because the Court must have some reasonable basis to infer that Plaintiffs' experience of primarily performing non-exempt tasks as their primary duty in contravention to stated policies is similar to the experience of thousands of putative class members. *Id.* at *41. Plaintiffs' evidence, however, remains insufficient to support the certification of a collective of more than 3,000 ASMs in 48 states across the country.

Fundamentally, Plaintiffs do not satisfy their burden because their testimony reveals vast discrepancies which directly refute any notion that they are even similarly situated to each other.[36] Indeed, from their contrasting views on the reporting structure (*supra* n.17), personal involvement in hiring,[37] disciplining,[38] supervising,[39] and directing,[40] the record is just as (if not

---

[36] *Guillen III*, 2012 U.S. Dist. LEXIS 91639, at *2-5 (no "factual nexus between [plaintiffs'] own wage and hour claim and the claims of thousands of other [ASMs] across 830 Marshalls stores" because Plaintiff's allegations rest upon ASM testimony, "each of which recounts individual incidents of being required to perform non-exempt tasks.").

[37] Ex. 8, Costa ¶¶ 215:6-15 (gave final decision to hire in the absence of the SM), 171:15-22(made recommendations for hire and positions where candidates should be assigned); Ex. 13, Roberts II ¶¶ 92:19-21 (interviewed two employees), *but see* Roberts II ¶¶127:24-128:11 (co-ASM testified Roberts avoided his requests to interview candidates), Ex. 1, p. 142, ¶ 36 (same); Ex. 9, Razzetti ¶¶ 137:16-25 (interviewed applicants and performed reference checks), 144:25-145:7 (since October 2013, "all ASMs are involved in the interview and hiring process"); Ex. 16, Santillan I ¶ (interviewed candidates and gave her opinion to the SM); Ex. 11, Ghanem ¶ 219:2-13 (SM asked him to sit in on interviews), 219:5-13 (gave his opinion of applicant); Ex. 15, Ramirez ¶¶ 91:4-93:18 (interviewed candidates and offered her opinion of them); Ex. 10, Dickey ¶¶ 81:16-82:3 (SM had her sit it on interviews so she could learn how to conduct those interviews herself in the future); Ex. 14, McKenzie ¶ 60:11-16 (interviewed once or twice); Ex. 4, Burns ¶¶ 178:13-18 (SM did not want him to interview candidates); Ex. 2, Pirolo ¶¶ 169:2-6 (all ASMs decided whether or not to interview applicants based on application); Ex. 3, Sciotto ¶¶ 83:3-6 (all ASMs involved in hiring), 151:23-152:21 (Merchandise ASMs would interview applicants and offer feedback to SM), 144:22-145:23 (same); Ex. 6, Zahtila ¶ 99:3-11 (as Operations ASM, he interviewed dozens of applicants); Ex. 5, Corway ¶ 214:2-8 (same); Ex. 2, Pirolo ¶ 181:4-8 (hired 25 applicants per year).

[38] Ex. 8, Costa ¶¶ 84:13-22, 170:20-180:13, 182:24-183:17, 186:10-25, 188:10-17, 195:14-21 (ASMs made recommendations for terminations); Ex. 11, Ghanem ¶ 67:3-17, 289:25-291:8, 295:15-20 (ASMs' responsibility to

18

more) diverse than the testimony provided in *Ahmed*. *See Ahmed III* (denying conditional certification where Plaintiffs and the opt-ins' testimony showed disparities in their experiences).

Plaintiffs' testimony was, however, consistent in so far as they placed blame on their particular SM or DM for performing non-exempt tasks. *See supra* n.23-24, 34. This type of evidence certainly cannot form the basis of a factual nexus between Plaintiffs' understanding and perception of their jobs as ASMs and the experiences of thousands of other ASMs who never worked for Plaintiffs' particular SM or DM. Indeed, even other ASMs who worked for the same SM or DM had different experiences than Plaintiffs. *See* Ex. 1 (co-ASM Declarations). Thus, Plaintiffs' were not even similarly situated to their ASM peers.

To conclude there is evidence of a de-facto policy, this Court must reasonably infer that the existence and/or testimony from eleven claimants in a small fraction of stores somehow

---

supervise and discipline), 295:21-300:24 (disciplined employee without SM); Ex. 9, Razzetti ¶ 145:18-147:9 (issued corrective action), 185:13-186:11 (disciplined employees); Ex. 16, Santillan I ¶¶ 74:15-21 (signed off on corrective action), 134:19-22, 280:6-281:3 (disciplined associate for not following ASM's instruction); Ex. 13, Roberts II ¶¶ 105:10-18, 106:6-14, 152:24-153:13, 159:5-20; Ex. 14, McKenzie ¶¶ 154:6-9, 155:19-157:20, 165:4-6; Ex. 4, Burns ¶¶ 201:16-23 (no role in disciplining employees), but see 224:15-226:16 (corrective action he signed), 212:11-212:12; Ex. 10, Dickey ¶¶ 102:10-21 (did not discipline or counsel associates); Ex. 3, Sciotto ¶ 233:5-9 (Merchandise ASMs have authority to write corrective actions); Ex. 2, Pirolo ¶ 217:19-219:7 (all ASMs responsible for documenting attendance, which can lead to disciplinary measures), Ex. 5, Corway ¶ 246:16-23 (same); Ex. 6, Zahtila ¶ 142:2-6 (same).

[39] Ex. 8, Costa ¶¶ 49:29:50:3 ("All the [ASMs] were responsible with leading the store . . . ."), 109:21-110:10 (he supervised from the DM's direction); Ex. 13, Roberts II ¶ 111:16-112:7 (followed up and provided constructive feedback to subordinates); Ex. 10, Dickey ¶ 58:18-24 (tried to lead with vision); Ex. 14, McKenzie ¶¶ 55:9-56:6 (observed work of associates), 201:11-202:10 (same); 56:17-57:4 (managed quality of work and work flow), 92:2-7 (directed associates for floor moves), 117:19-118:4 (walked the floor to identify issues); Ex. 15, Ramirez ¶ 247:19-21 ("The store basically runs itself. If there's a problem, that's when they'll call for an assistant manager); *but see* Ex. 4, Burns ¶ 92:25-93:5 (did not oversee associates); Ex. 9, Razzetti ¶¶ 96:19-97:7 (same); Ex. 16, Santillan I ¶¶ 36:3-11 (same)

[40] Ex. 8, Costa ¶ 106:7-14 (associates went to ASMs to see what the directives were for the day); Ex. 13, Roberts II ¶ 105:1-9 (delegated tasks); Ex. 12, Roberts I ¶42:12-43:10 (handful of employees reported to her); Ex. 10, Dickey ¶122:21-24 (SM told her what to assign to employees); Ex. 14, McKenzie ¶¶ 95:19-25 (told associates what needed to be done), 119:8-15 (same), 166:18-21 (same); Ex. 6, Zahtila ¶¶ 220:16-221:18 (ASMs create daily agenda of what needs to be done when the SM is not present), 229:6-230:4 (ASMs direct priority of assignments to be completed), 296:11-298:3 (formulated his own recovery plan); Ex. 5, Corway ¶ 97:6-15 (all ASMs reassign employees), 104:4-23 (ASMs "had the autonomy to make the decision" of things to complete in the SM's absence); Ex. 4, Burns ¶¶ 157:3-23 (assigned tasks to associates with SM directions), 163:11-25 (same); Ex. 9, Razzetti ¶¶ 97:18-98:5 (passes along directions from SM); *but see* Ex. 16, Santillan I ¶ 353:2-6 (not her job to provide direction to her subordinates)

represents the practices at over 1,200 stores in 48 states and the experiences of over 3,000

putative collective members, *notwithstanding their diverse testimony regarding their own job

duties*.  It is hard to imagine how Plaintiffs could possibly satisfy their burden of producing

"significant evidence" of a de-facto policy, relying solely on Plaintiffs' testimony which

represents a meager one-third of one percent of all putative class members.  Moreover, the Court

would also have to ignore the testimony of eighteen ASMs – all of whom have worked with

Plaintiffs and the opt-ins – and have testified regarding their direct knowledge regarding

Plaintiffs' regular exercise of managerial responsibilities.[41]  Ex. 1.  It is this contrasting record,

and the logical, common sense conclusion which must be drawn from this evidence, that explains

why this motion has been denied *seven* times in the Prior TJX Cases.[42]

    **C.**    **The Same Deficiencies Identified In The Prior TJX Decisions Remain.[43]**

        **1.**    **Plaintiffs' "narrowly defined" class is, in fact, broader and more far
              reaching than any prior putative class sought to be certified.**

    While Plaintiffs limit the putative FLSA collective to Merchandise ASMs, this group

includes over 3,000 ASMs in more than 1,200 stores across two separate and distinct companies

---

[41] Plaintiffs contend that the declarations from Plaintiffs' co-ASMs actually support their motion (notwithstanding that they testified they were managers and were heavily involved in managerial duties) because they acknowledged they performed limited non-exempt tasks.  Ptf. Br. p. 22.  Such contention defies common sense, as the performance of non-exempt tasks is not dispositive of whether an employee is properly classified as exempt.  *See* 29 C.F.R. § 541.106(a), (b) (permitting the performance of non-exempt tasks), *Ahmed III*, n.8.  Moreover, the decision in *Ferreira v. Modell's Sporting Goods, Inc.*, Civ. No. 11-2395 (DAB), 2012 U.S. Dist. LEXIS 100820, at *8-9 (S.D.N.Y., July 16, 2012), did not turn on defendant Modell's declarations, which revealed ASMs performed non-exempt tasks.  Rather, in *Modell*, the court focused on Modell's job descriptions which "demand[ed] the performance of non-exempt duties."  *Id.*  The court then distinguished the *Jenkins* and *Guillen* decisions because Marshalls and HomeGoods, unlike the evidence in Modell's, maintained lawful job descriptions and policies.  *Id.*

[42] *See Jenkins,* 853 F. Supp. 2d at 324 (rejecting Plaintiff's argument:  "[T]he argument that a plaintiff need only show that he performed tasks in contravention of a common legal policy 'boils down to the proposition that any employee classified as exempt by a company that does business nationwide is entitled to approval of a collective action for all employees of that business – who may number in the thousands and be spread across 50 states -- simply based on the employee's testimony that he was required to perform non-exempt tasks'") (quoting *Guillen II*).

[43] Under principles of comity, the Prior TJX Cases should receive due deference.  *See Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 (2011) (Justice Kagan stated that "we would expect federal courts to apply principles of comity to each other's class certification decisions when addressing a common dispute."); *see also Baker v. Home Depot USA, Inc.*, 2013 U.S. Dist. LEXIS 9377, at *14 (N.D. Il. Jan. 24, 2013) (citing *Smentek v. Dart*, 683 F.3d 373 (7th Cir. 2012)) ("[W]ith respect to proposed class action litigation [], based upon the principle of comity, courts are required 'to pay respectful attention to the decision of another judge in a materially identical case.'").

– which is larger than the putative classes sought to be certified in any of the Prior TJX Cases. ¶ 18. Limiting the putative collective to Merchandise ASMs is a distinction without a difference; the Courts in the Prior TJX Cases did not deny conditional certification because the plaintiffs in those cases included Operations ASMs as well as Merchandise ASMs as part of the putative collective.  Rather, these motions were denied because, as here, there was insufficient evidence for the Court to reasonably infer that they were similarly situated to the putative collective.  For example, in *Ahmed*, the Court found that Plaintiff was not similarly situated to Merchandise ASM Moore, who had "exempt managerial responsibilities."  *Ahmed III*, at *17.  ASM Moore in *Ahmed* is akin to Merchandise ASM Costa here – both assumed significant managerial responsibilities.  In fact, unlike ASM Moore, Plaintiff Costa managed stores for many months when an SM vacancy existed.  *See supra* n.21.  In short, Plaintiffs' "narrowly defined" class is in fact larger and even more inappropriate for class adjudication.

### 2.   Plaintiffs' Evidence Is Substantively No Different Than The Evidence Previously Presented In The Prior TJX Cases.

The evidentiary record here is, in fact, substantively analogous to the record previously submitted in the Prior TJX Cases.  Indeed, Plaintiffs here rely on the same policies, pay practices and documents as those presented in the Prior TJX Cases.  Plaintiffs even rely upon testimony from the same *parties*, as Plaintiff Santillan and opt-in Razzetti were/are opt-in plaintiffs in the *Guillen* and *Ahmed* actions, respectively.  *See supra* n.2.  As such, the analyses and determinations reached in each of the Prior TJX Cases concerning Defendants' policies are equally relevant here, and Plaintiffs' attempts to distinguish the Prior TJX Cases are misplaced.[44]

---

[44] The decisions in *Augustyniak v. Lowe's Home Improvement Center, LLC, et al.*, 14-cv-488 (JJM), 2015 U.S. Dist. LEXIS 110359, at *41-42 (W.D.N.Y. Aug. 20, 2015) and *Baker v. Home Depot USA, Inc.*, 11-cv-6788, 2013 U.S. Dist. LEXIS 9377 (N.D. Il Jan. 24, 2013), are particular noteworthy, as both courts were faced with identical motions that were previously denied in other jurisdictions.  In *Lowes*, the court declined to grant conditional certification and considered the adverse testimony offered by the opt-ins in the original lawsuit.  In *Home Depot*, the court similarly declined to certify a class, struck class claims, and found that the defects identified by the courts in

Indeed, the evidence provided in *Jenkins* is, in fact, *identical* to the evidence provided here in support of conditionally certifying a class of HomeGoods Merchandise ASMs. In *Jenkins*, there was one plaintiff who claimed that his experience was similar to those of other HomeGoods ASMs nationwide. Relying on his own testimony and the existence of lawful policies, Plaintiff Jenkins alleged that all ASMs nationwide were misclassified as exempt. Here, Plaintiff Ghanem is the sole individual who worked as a Merchandise ASM at HomeGoods.[45] Plaintiff Ghanem testified that because of personality conflicts with his SM, he "was treated completely differently than the other two ASMs under her supervision" and that those ASMs performed managerial duties that he did not. Ex. 11, Ghanem ¶¶ 121:11-122:2, 130:6-12. Plaintiff Ghanem's testimony does not suddenly have more effect merely because Plaintiffs sought to combine his allegations with that of other ASMs at *Marshalls* – a different company. As a result, the evidentiary showing in support of conditional certification of a class of HomeGoods ASMs is just as insufficient as the submission submitted to the court in *Jenkins*.[46]

Similarly, the evidence submitted here is actually a fraction of the evidence previously

---

the five prior actions were similarly present in the instant case. *Id.* at * 15. Here, this Court should consider not only the evidence offered in the Prior TJX Actions (which is substantively identical to that provided here), but also the courts' analyses and reasoning applied to that evidence.

[45] While Plaintiffs also rely on the testimony from opt-in Razzetti, the record reflects that she worked at T.J. Maxx stores throughout her tenure. In fact, she is an opt-in in *Ahmed* and is seeking the same relief in that action as she is here for the same period of time. *See Ahmed*, 10-cv-3609, Razzetti Consent To Sue (Dkt. 122). In *Ahmed*, she claimed she was a T.J. Maxx employee. *See Ahmed*, 10-cv-3609, "Notice of New Opt-In" (Dkt. 123) ("Ms. Razzetti worked for seven different T.J. Maxx stores"). Here, she claims that she was a HomeGoods employee because she worked in a combo store (*i.e.*, a store that has a T.J. Maxx and HomeGoods merchandise under one roof). Notably, opt-in Razzetti testified that at the combo store, she held two ASM positions: ASM of T.J. Maxx (*i.e.*, Merchandise ASM) and Customer Service ASM. Ex. 9, Razzetti ¶¶ 62:18-24, 61:3-6 (never designated as the HomeGoods ASM); Ex. 18, Brady ¶ 4 (HomeGoods does not have a Customer Service ASM position). Opt-in Razzetti, therefore, has no standing to testify concerning practices at HomeGoods stores.

[46] In *Jenkins*, plaintiff submitted the relevant page of a *2009* study, attached as Exhibit P to Plaintiff's motion for conditional certification. Based on a review of that document, the *Jenkins* court declined to give significance to the study because any inference "would be completely speculative." *Jenkins*, 853 F. Supp. 2d 317, 322. Similarly, reliance on the study here would be misplaced, as it (1) is over *six* years old (thereby providing no insight as to the practices of the putative class over the past *three* years); (2) does not reflect the stores where Plaintiffs worked, but instead analyzed only three stores in Massachusetts; (3) is a report created by a vendor, who HomeGoods retained to identify efficiencies and improve store operations, not analyze the exempt status of ASMs; and (4) identified broad categories of work in the pie chart that also include managerial duties.

provided to the *Ahmed* court.  In fact, the plaintiff in *Ahmed* argued in support of their renewed motion for conditional certification that he "produced testimony from . . . former and current employees of Defendant, from nine states and multiple stores within each state. . . ."  *Ahmed*, P's Renewed Motion, p. 16 (Dkt. 110-1, filed 12-6-13).  Plaintiff *Ahmed* likewise claimed that his evidentiary record, consisting of nine opt-ins and no less than twenty-two current and former employees of T.J. Maxx, which – identical to the argument made here – purportedly "distinguishe[d] [*Ahmed*] from *Jenkins*, *Guillen I*, and *Guillen II*, and justifie[d] conditional certification of the proposed nationwide class."  *Ahmed*, P's Renewed Motion, p. 2-3, 17. Ultimately, the *Ahmed* court disagreed and concluded that Plaintiff Ahmed's evidence failed to demonstrate a factual nexus tying his own overtime claim to that of thousands of ASMs nationwide.   Denial of conditional certification based on a larger number of named Plaintiffs and opts-ins is particularly appropriate here given that *Ahmed* involved an even larger number of individuals from a larger geographic area than is presented here.

Finally, Plaintiffs try to distinguish *Guillen* on the grounds of the limited geographic scope of evidence presented there, but they overlook the critical and independent flaw in *Guillen*. Specifically, *before* addressing the geographic limitation in plaintiff's evidence, Chief Judge Preska stated that "Plaintiff's allegations are deficient [in satisfying their burden], resting on a handful of ASM affidavits, each of which recounts *individual incidents* of being required to perform non-exempt tasks."  *Guillen*, 2012 U.S. Dist. LEXIS 91639, at *4-5 (emphasis added").  The *Guillen* court rejected plaintiffs' class theory because the "individualized incidents" of plaintiff and six opt-ins could not be extended to thousands of ASMs across the country.  *Id.*, at *6.  Here, Plaintiffs recounted the same type of "individual incidents," wherein they placed blame on their SM or DM for performing non-exempt tasks – not some common policy.  *See*

*supra* n.23-24, 34  Moreover, Plaintiffs also provided limited, if any, testimony regarding the experiences of other ASMs in their own stores, much less stores elsewhere.  *See supra* n.28.  In fact, Plaintiffs often testified and/or acknowledged that their experiences of performing non-exempt tasks were drastically different than those of their fellow ASMs.  *Id.*  Thus, the justification for rejecting the plaintiffs' evidence in *Guillen* is equally applicable here.

### 3.    Plaintiffs Have Offered This Court No Reason to Depart From the Precedent Established In The Prior TJX Decisions.

Over one hundred fifteen courts within and outside the Second Circuit have cited the Prior TJX Cases when asked to analyze the "appropriateness" of notice in misclassification cases.  No less than four federal judges, including Chief Judge Preska of the Southern District of New York and Senior District Judge Spatt of the Eastern District of New York, analyzed the same evidence here and deemed it insufficient to satisfy Plaintiffs' burden – which is why this Action was filed in Massachusetts.  *See* Prior TJX Cases.  Plaintiffs believe these cases were "wrongly decided" – only because their various motions for conditional certification were repeatedly denied.  They had no legal "right" to this discretionary relief.  These courts acted well within their discretion in the management of their dockets to determine that the Prior TJX Cases were not "appropriate" for the issuance of notice.  *See Hoffman-LaRoche, Inc.*, 493 U.S. 165.

Plaintiffs cite to numerous decisions which have granted conditional certification (Ptf. Br. n.47), and all of those cases were decided based upon their own records, and those employers' practices and policies.  There are similarly dozens of cases which have denied conditional certification, as an act of judicial discretion, based upon the particular record presented to those courts.[47]  The question that should be asked here – and which Plaintiffs have not answered – is

---

[47] All of the following cases *denied* conditional certification and cited one or more of the Prior TJX Cases in their decision:  *Reyes v. Nidaja, LLC*, 14-cv-9812, 2015 U.S. Dist. LEXIS 101728 (S.D.N.Y. July 31, 2015); *Becerra v. IM LLC-I*, 14-cv- 2671, 2015 U.S. Dist. LEXIS 56240 (E.D.N.Y. Apr. 29, 2015); *Folger v. Medicalodges, Inc.*, 13-

whether they have proven to *this* Court, now as they seek the certification of an FLSA collective and the sending of notice to thousands of ASMs, that the precedent established in the Prior TJX Cases should be disregarded. Plaintiffs have not met this burden here.

## V.    CONCLUSION

The evidence presented by Plaintiffs is plainly insufficient to support collective adjudication. Examined closely, the evidence reflects that Plaintiffs and opt-ins were managers, that their own experiences varied wildly, and that to the extent they performed non-exempt work it was because of their own particular store or district manager. Despite voluminous discovery, Plaintiffs cannot and do not point to a single policy which is unlawful on its face and would warrant certifying a class. Bathed in the light of this as Plaintiffs' *tenth* motion to conditionally certify a collective of ASMs employed by distinct subsidiaries of The TJX Companies, Inc., Defendants respectfully submit that this Honorable Court should deny Plaintiffs' motion *with prejudice*.

Date:    September 18, 2015                  *Attorneys for Defendants*
         Melville, New York


Gregory C. Keating (gkeating@choate.com)     Justin R. Marino (jmarino@littler.com)
CHOATE, HALL & STEWART, LLP                  LITTLER MENDELSON, P.C.
Two International Place                       Andrew J. Voss (avoss@littler.com)
Boston, MA 02110                             Lisa A. Schreter (lschreter@littler.com)
                                             Richard W. Black (rblack@littler.com)
                                             290 Broadhollow Road, Suite 305
                                             Melville, NY 11747
                                             631.247.4700


1203-MLB, 2014 U.S. Dist. LEXIS 86286 (D. Kan. Jun 25, 2014); *Gu v. T.C. Chikurin, Inc.*, 13-cv-2322, 2014 U.S. Dist. LEXIS 53813 (E.D.N.Y. April 17, 2014); *Moore v. PNC Bank, N.A.*, 2:12-cv-1135, 2013 U.S. Dist. LEXIS 74845 (W.D. Pa. May 29, 2013); *Zhang v. Bailey Produce, Inc.*, 12-CV-1045, 2013 U.S. Dist. LEXIS 57544 (E.D.N.Y. Apr. 22, 2013); *Ali v. New York City Health & Hosps. Corp.*, 11-cv-6393, 2013 U.S. Dist. LEXIS 44091 (S.D.N.Y. March 27, 2013); *Hall v. Guardsmark, LLC*, 11-cv-213, 2012 U.S. Dist. LEXIS 116129 (W.D. Pa. Aug. 17, 2012); *Khan v. Airport Mgmt. Servs., LLC*, 10-cv-7735, 2011 U.S. Dist. LEXIS 133134 (S.D.N.Y. Nov. 16, 2011); *Bramble v. Wal-Mart Stores, Inc.*, 09-cv-4932, 2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Apr. 11, 2011).

## LOCAL RULE 7.1 CERTIFICATION

I hereby certify that on this 18th day of September, 2015, counsel for Defendants previously conferred and attempted in good faith to resolve or narrow the subject matter of this motion.

## CERTIFICATE OF SERVICE

I, Justin R. Marino, hereby certify that on this 18th day of September 2015, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and that I am not aware of any party to this action that is not a registered participant.

/s/